# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| **Peter Merz, Individually,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No: 1:14-cv-103** |
| | : | |
| **v.** | : | **Judge:** |
| | : | |
| **Opportunities for Ohioans with Disabilities** | : | **Magistrate Judge:** |
| | : | |
| | : | |
| **and** | : | **Complaint** |
| | : | |
| **Kevin L. Miller, in his official capacity,** | : | |
| | : | |
| **Defendants.** | : | |

## I.  INTRODUCTION

1.  Each paragraph in this Complaint incorporates all others.

2.  This case involves the efforts of Peter Merz, a recent high school graduate with an intellectual disability, to receive support for post-secondary educational training from Ohio's state vocational rehabilitation agency, Opportunities for Ohioans with Disabilities ("OOD"), Bureau of Vocational Rehabilitation ("BVR"), in order to prepare for competitive and gainful employment.

3.  As the designated vocational rehabilitation agency for Ohio, OOD is charged with determining on an individual basis, together with the eligible individual, what vocational rehabilitation services would enable the individual to become competitively employed.

4.  In light of data showing that students with intellectual disabilities achieve far better competitive employment outcomes with post-secondary training, Congress and the U.S. Department of Education recently established comprehensive post-secondary transition programs for students with intellectual disabilities ("Comprehensive Transition Programs"), which provide

{00068666-5}

academic, vocational, and independent living training to prepare students with intellectual disabilities for competitive employment.

5.      While post-secondary training is a vocational rehabilitation service available for other consumers, OOD has effectively barred students with intellectual disabilities from post-secondary training through a statewide policy refusing to provide support for Comprehensive Transition Programs, in violation of the Rehabilitation Act.

6.      Recognizing that he needed additional training to make the transition from school to work, Peter applied to OOD for vocational rehabilitation services as a high school senior and subsequently enrolled in the University of Cincinnati's Transition and Access Program (TAP), a four year Comprehensive Transition Program providing academic, vocational, and independent living training for transition students with intellectual disabilities.

7.      Soon after he was found eligible for services, Peter expressed interest in a career related to sports and identified the transition services provided by the TAP program as vocational rehabilitation services necessary for him to reach his employment goal.

8.      More than thirteen months after he first applied for services, OOD informed Peter that it would not support his participation in the TAP program, and Peter was given the choice of either dropping out of the TAP program and seeking immediate job placement or having his case with the agency closed.

9.      Peter appealed Defendants' decision to deny support for the TAP program and close his case, and pursuant to 29 U.S.C. § 722(c)(5) a Fair Hearing was held on December 2 and 17, 2013.  A decision was rendered on January 16, 2014, denying Peter's appeal.

10.      Peter files this civil action for *de novo* review of that decision pursuant to 29 U.S.C. § 722(c)(5)(J) and relief under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

## II.    JURISDICTION AND VENUE

11.    This cause of action is found at 29 U.S.C. § 722(c)(5)(J), which allows for a civil action to be filed without regard to the amount in controversy.

12.    This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331, general federal question jurisdiction, because the Plaintiff's claims arise under federal statute: the Rehabilitation Act of 1973.

13.    Pursuant to 28 U.S.C. § 1391(b)(1) venue lies in the Southern District of Ohio because a substantial part of the events or omissions giving rise to the claim occurred in Hamilton County.

## III.    PARTIES

14.    Plaintiff, Peter Merz, is a disabled individual residing in Cincinnati, Ohio.

15.    OOD is the designated state unit in Ohio that provides vocational rehabilitation services to persons with disabilities pursuant to Title I of the Rehabilitation Act of 1973, as amended.  29 U.S.C. § 701, *et seq.*

16.    Defendant, Kevin L. Miller, was appointed by the Governor to be the executive and administrative officer of OOD, and is charged with devoting his full time to running that office pursuant to Ohio Rev. Code § 3304.15.

## IV.    FACTS

17.    The administrative record, which Defendants must file with this Court pursuant to 29 U.S.C. § 722(c)(5)(J), is hereby incorporated by reference.

### Background

18.    Peter was born with Down Syndrome, and due to his disability, he has cognitive impairments and communication limitations.

19.    Peter attended Oak Hills High School, a large public high school near Cincinnati,

where he was educated pursuant to an individualized education plan (IEP) under the Individuals with Disabilities Education Act (IDEA).

20.    Peter excelled in high school, attending integrated classes, and participating in extracurricular activities with non-disabled peers.

21.    As required by the IDEA, during his senior year in high school Peter, his parents, and school district officials including both general and special education teachers, began planning to prepare a transition IEP detailing Peter's goals following high school and the services he would need to achieve them.  (Appellant Ex. B.)[1]

22.    Peter's goal following high school was to obtain competitive employment in order to support himself and live independently, and as part of the transition process, Peter began to explore his career options.

23.    After serving as the equipment manager for his high school basketball team, Peter became interested in pursuing a career related to sports.

24.    However, due to his cognitive disability, Peter had difficulty with independent problem solving, and also required additional training in life skills, independent living, and organization in order to prepare for competitive employment that suited his interests.

25.    Peter considered local job training programs for students with intellectual disabilities, but found that they did not meet his needs because they were focused on low-wage and low skilled janitorial positions, were segregated, had poor employment outcomes, and did not provide the independent living skills he needed.

26.    Ultimately Peter, his parents, and school district officials all agreed that Peter needed post-secondary training following high school graduation to reach his goal of obtaining

---

[1] References to Appellant Ex. ___ are to the Plaintiff's exhibits from the formal hearing, which are included in the administrative record which Defendants must file with this Court pursuant to 29 U.S.C. § 722(c)(5)(J).

competitive employment, and college training in a supported environment was included on Peter's transition IEP.

27.     Because Peter intended to pursue competitive employment, his high school referred him to OOD for vocational rehabilitation services pursuant to an interagency agreement for transition planning between the Ohio Department of Education and Opportunities for Ohioans with Disabilities.

## Vocational Rehabilitation

28.     The purpose of the Rehabilitation Act, as set forth in 29 U.S.C. § 701, *et seq*. is to empower individuals with disabilities to maximize employment, economic self-sufficiency, independence, inclusion, and integration into society.

29.     In order to prepare individuals with disabilities for gainful employment, the Rehabilitation Act created a comprehensive program for vocational rehabilitation, providing federal funding to states to assess, plan, develop, and provide vocational rehabilitation services for individuals with disabilities, consistent with their strengths, resources, priorities, concerns, abilities, capabilities, interests, and informed choice.

30.     State participation in the federal vocational rehabilitation program is voluntary, but states choosing to participate must comply with federal law and regulations under Section 720 of the Rehabilitation Act.

31.     OOD is the designated state unit in Ohio that provides vocational rehabilitation services to persons with disabilities pursuant to the Rehabilitation Act 29 U.S.C. § 701, *et seq*., and BVR is the division of OOD that provides rehabilitation services to individuals, like the Plaintiff, whose disabilities are not blindness or other visual impairment.

32.     Once an individual has been found eligible for services, an individualized plan for employment (IPE) must be developed and implemented in a timely manner.  34 C.F.R. §

361.45(a)(1).

33.     The IPE must contain ". . . a description of the specific employment outcome that is chosen by the eligible individual," and "a description of the specific vocational rehabilitation services that are . . . needed to achieve the employment outcome."  29 U.S.C. § 722(b)(3)(A)-(B).

34.     Vocational rehabilitation services provided under 29 U.S.C. § 720, *et seq*. "are any services described in an individualized plan for employment necessary to assist an individual with a disability in preparing for, securing, retaining, or regaining an employment outcome . . . including . . . an assessment for determining . . . [the] vocational rehabilitation needs" of the individual.  29 U.S.C. § 723(a)(1).

35.     Additionally, an IPE "shall be developed and implemented in a manner that affords eligible individuals the opportunity to exercise informed choice in selecting an employment outcome, the specific vocational rehabilitation services to be provided under the plan, the entity that will provide the vocational rehabilitation services, and the methods used to procure the services . . . ."  29 U.S.C. § 722(b)(2)(B).

36.     Federal regulations require each state unit to enter into an interagency agreement with public education officials ". . . designed to facilitate the transition of students with disabilities from the receipt of educational services in school to the receipt of vocational rehabilitation services under the responsibility of the designated State agency."  34 C.F.R. § 361.22(a).

37.     The interagency agreement must ". . . provide for the development and approval of an individualized plan for employment in accordance with § 361.45 as early as possible during the transition planning process but, at the latest, by the time each student determined to be

eligible for vocational rehabilitation services leaves the school setting . . . ." 34 C.F.R. § 361.22(a).

38. An IPE for a student receiving special education services must be developed in consideration of the student's individualized education plan. 34 C.F.R. § 361.45(d)(8)(i).

39. Federal regulations require that:

> [a]s appropriate to the vocational rehabilitation needs of each individual and consistent with each individual's informed choice, the designated State unit must ensure that the following vocational rehabilitation services are available to assist the individual with a disability in preparing for, securing, retaining, or regaining an employment outcome that is consistent with the individual's strengths, resources, priorities, concerns, abilities, capabilities, interests, and informed choice:
> . . .
> (c) Vocational rehabilitation counseling and guidance, including information and support services to assist an individual in exercising informed choice in accordance with § 361.52.
> . . .
> (f) Vocational and other training services, including personal and vocational adjustment training, books, tools, and other training materials . . .
> . . .
> (r) Transition services in accordance with the definition of that term in § 361.5(b)(55).

34 C.F.R. § 361.48.

40. Transition services are defined in the Rehabilitation Act as

> [a] coordinated set of activities for a student, designed within an outcome-oriented process that promotes movement from school to post school activities including postsecondary education, vocational training, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation. The coordinated set of activities shall be based upon the individual student's needs, taking into account the student's preferences and interests, *and shall include instruction, community experiences, the development of employment and other post school adult living objectives*, and when appropriate, acquisition of daily living skills and functional vocational evaluation.

29 U.S.C. § 705(37) (emphasis added); *see also* 29 U.S.C. § 723(a)(13); 34 C.F.R. § 361.5(b)(55); Ohio Admin. Code § 3304-2-59(14); *compare with* 20 U.S.C. § 1401(34) (defining transition services under the IDEA).

## Transition Programs for Students with Intellectual Disabilities

41.     Individuals with intellectual disabilities have historically had a disproportionately low rate of employment, and those who are employed are far more likely to work in sheltered workshops paying subminimum wages than in competitive employment in an integrated setting.

42.     In light of evidence that competitive employment outcomes are significantly higher for individuals with intellectual disabilities who receive some post-secondary training, in 2008, Congress passed the Higher Education Opportunity Act of 2008 (HEOA), which charged the U.S. Department of Education with creating Comprehensive Transition Programs to provide post-secondary training for transition students with intellectual disabilities to prepare for gainful employment.

43.     Pursuant to the HEOA, the Department of Education designated a coordinating center, Think College, to promulgate standards and best practices for Comprehensive Transition Programs, awarded grants for the creation of model programs across the country, and announced rules for these programs to qualify for federal financial student aid.

44.     U.S. Department of Education issued regulations, codified at 34 C.F.R. § 668.231, defining "comprehensive transition program" as follows:

> (a) Comprehensive transition and postsecondary program means a degree, certificate, nondegree, or noncertificate program that—
> (1) Is offered by a participating institution;
> (2) Is delivered to students physically attending the institution;
> (3) Is designed to support students with intellectual disabilities who are seeking to continue academic, career and technical, and independent living instruction at an institution of higher education in order to prepare for gainful employment;
> (4) Includes an advising and curriculum structure;

(5) Requires students with intellectual disabilities to have at least one-half of their participation in the program, as determined by the institution, focus on academic components through one or more of the following activities:

(i) Taking credit-bearing courses with students without disabilities.

(ii) Auditing or otherwise participating in courses with students without disabilities for which the student does not receive regular academic credit.

(iii) Taking non-credit-bearing, nondegree courses with students without disabilities.

(iv) Participating in internships or work-based training in settings with individuals without disabilities; and

(6) Provides students with intellectual disabilities opportunities to participate in coursework and other activities with students without disabilities.

34 C.F.R. § 668.231.

45. The HEOA further requires that Comprehensive Transition Programs must offer a meaningful credential to students completing the program. 20 U.S.C. § 1140g(d)(8).

46. The HEOA contemplates coordination with state vocational rehabilitation agencies by giving preference for grants to model Comprehensive Transition Programs which have developed partnerships with state vocational rehabilitation agencies. 20 U.S.C. § 1140g(c)(3)(A).

## University of Cincinnati's TAP Program

47. In 2012, the University of Cincinnati launched the Transition and Access Program (TAP), a Comprehensive Transition Program for students with intellectual disabilities, funded in part by a grant from the U.S. Department of Education pursuant to the HEOA.

48. The University of Cincinnati is a state-chartered university accredited by the Higher Learning Commission (HLC).

49. Now in its second year, the TAP program trains students with intellectual disabilities for gainful employment by providing college classes, including classes in an

integrated setting with nondisabled students; training in independent living skills through a residential program; and four required paid internships with support provided by program staff.

50.     The TAP program is housed within the University of Cincinnati's School of Education, and it is staffed by faculty of the school, licensed special education teachers, and graduate instructors.

51.     The TAP program provides academic advising to each student to identify career goals and interests, and tailors the student's academic coursework and internship placements to prepare the student to meet his or her career goals.

52.     TAP students are required to complete a series of four paid internships in an integrated setting, so that students gain exposure to a variety of employers and office settings and develop additional workplace skills and experience.

53.     At the conclusion of the four year course, students receive a certificate of completion, and they have references and a digital portfolio documenting their work history and employment skills.

54.     The TAP program adheres to the standards and best practices promulgated by the Department of Education's designated coordinating center, and the TAP program also complies with Department of Education regulations for comprehensive transition programs, and the program is now preparing to submit its application for certification to the Department of Education to qualify for federal student aid.

## Peter's Participation in the TAP Program

55.     During the spring of 2012, before high school graduation, Peter applied and was admitted to the TAP program at the University of Cincinnati.

56.     Soon after he enrolled, Peter met with counselors from the TAP program to identify his career interests and to tailor a course of study and work experiences to prepare for

gainful employment.

57.     Because Peter expressed an interest in a career related to sports, counselors with the TAP program helped him design a specific program of academic, vocational, and independent living skills necessary for him to achieve his career goal.

58.     In his first year and a half of the TAP program, Peter has completed courses focusing on job skills such as preparing a resume, interviewing, and workplace expectations, and independent living skills such as managing money.

59.     Peter has also enrolled in academic courses related to sports with non-disabled University of Cincinnati students, in order to develop his knowledge about a variety of sports.

60.     In order to become qualified for a wider range of jobs related to sports by developing skills and experience in office work, Peter completed a paid internship with the University of Cincinnati Psychology Department with the assistance of job coaches from the TAP program during the spring semester of his first year.

61.     Beginning in his second year, Peter moved on campus to an integrated dorm with nondisabled students, and he has continued his academic, vocational, and independent living training through the TAP program.

62.     Following his internship with the Psychology Department his first year, Peter was able to land a paid internship in an athletic department for the second semester of his sophomore year.

63.     Peter's income is limited to SSI and his wages from his paid internships through the TAP program, and his assets are extremely limited.

64.     Without support from the vocational rehabilitation agencies, Peter has been forced to rely on financial contributions from family members to attend the TAP program.

## Application for Vocational Rehabilitation Services

65.     In his final semester of high school, Peter applied for vocational rehabilitation services on April 24, 2012, and was found eligible for services soon after graduation, on July 2, 2012.  (Appellant Ex. A.)

66.     After Peter was found eligible for services, OOD assigned him to a vocational rehabilitation counselor, Chrystal Hutzel, who began a comprehensive assessment to determine Peter's vocational rehabilitation needs by gathering information from Peter and his mother, including Peter's IEP from high school, and information about the TAP program.

67.     On August 8, 2012, Ms. Hutzel made a referral to Goodwill Industries for Peter to participate in a vocational community based assessment.

68.     In her referral, Ms. Hutzel documented Peter's participation in the TAP program in order to obtain competitive employment with the following notes:  "Graduating this year . . . plans to go to UC.  Goals of school are photography and Math . . . wants to get a job" and "4 year program but it will be a certificate.  You take classes for audit.  It will be life skills (2) courses and 2 regular courses.  It will involve an internship component that begins in the 2nd semester."  (Appellant Ex. D.)

69.     Noting that "Peter would like to find a part time job working in a sports related environment," the Goodwill decided to place Peter in a janitorial position at a local YMCA focused exclusively on picking up trash and cleaning.  *Id*.

70.     After Peter completed the assessment, the Goodwill concluded in its report that Peter was not interested in janitorial work, and recommended that Peter participate in other work experiences and continue his enrollment in the TAP program, finding "it was evident that his college program is of great importance to him.  Also a post high school education will open the doors for Peter when looking for employment."  *Id*.

71.     Following the community based assessment, OOD provided Peter with no further counseling or guidance to exercise informed choice in selecting an employment outcome, and the agency failed to timely develop and implement an IPE for Peter.

72.     At a meeting with his counselor following the community based assessment, Peter informed Ms. Hutzel that he was not interested in janitorial work and when other job tryouts were discussed, Peter noted that he was in the process of interviewing for a paid internship for the spring semester through the TAP program.

73.     During this meeting, Ms. Hutzel informed Peter that she was considering closing his case with the agency until after he completed school, but at Peter's request, she agreed to look into whether OOD could support Peter's participation in the TAP program, but no conclusion was reached.

74.     Despite Peter's expression of interest in an employment goal of a career related to sports, neither Ms. Hutzel nor anyone else at OOD engaged in further discussion with Peter or indicated disagreement with this employment goal.

75.     Six months later, Peter and his mother met again with his counselor and provided an update on Peter's progress in the TAP program.

76.     Peter reported that he had successfully completed a paid internship as an office worker with the Psychology Department, and that he was able to learn the job and succeed with the supports provided by the program.

77.     Peter advised that he was planning to continue in the TAP program and move on campus for the second year, and his mother reported that Peter had made great progress in developing employment and independent living skills through the program.

78.     At the meeting, Peter and his mother again requested that OOD support Peter's

participation in the TAP program.

79. Again during this meeting, Peter's counselor did not engage in any discussion about Peter's job goal.

80. Following the meeting, Ms. Hutzel met with her supervisor and "explained that we need to determine next steps for developing [an individualized plan for employment] or case closure. Since we have not identified a goal a plan cannot be written at this time." (Appellant Ex. E.)

81. On June 11, 2013, another meeting was held with Peter, his mother, the director of the TAP program, Ms. Hutzel, and supervisor Jennifer Roeder.

82. At the meeting, Peter was advised that OOD "would not be able to support the [TAP] program in any way" and that "this information was passed down from Central Office and was a decision made Statewide." (Appellant Ex. F.)

83. At the meeting Ms. Roeder made clear that the agency's decision to deny support for Peter to attend the TAP program was not based on an individual assessment of Peter's needs, but rather was due to OOD's statewide policy refusing to support Comprehensive Transition Programs.

84. During the meeting, neither Ms. Roeder nor Ms. Hutzel indicated to Peter that the reason for the denial was the lack of an agreed upon employment goal.

85. During the meeting, neither Ms. Roeder nor Ms. Hutzel engaged in any further counseling or discussion with Peter about his employment goal.

86. Nevertheless, at the meeting Peter was informed that his options were either to quit the TAP program and seek immediate job placement, or to close his case and appeal OOD's decision not to support the TAP program.

87.     Following the meeting, Peter's counselor prepared a memo noting that she disagreed with the agency's decision not to support the TAP program: "Currently VRC has been provided no information as to the reasons behind this decision. VRC would like to better understand the rationale behind this decision being made across the board. VRC does see this program as an appropriate fit for this particular consumer, however, recognizing it is not a good fit for many of our consumers. VRC believes that the vocational component of this program appears relevant, but in addition sees the overall program as a step up from many of our services as it has been evidenced to show better long term success in employment when other areas have been addressed . . . ." (Appellant Ex. G.)

88.     Prior to closure, Peter's case file with the agency contained no documentation of any individualized determination by an OOD counselor or supervisor that the TAP program was not a necessary vocational rehabilitation service for Peter.

89.     On the mistaken belief that it was necessary to request case closure in order to appeal the agency's decision, based on information provided by the agency, Peter's mother made a request on Peter's behalf that his case be closed in order to file an appeal.

### Case Closure and Appeal

90.     On June 21, 2013, OOD closed Peter's case, and on July 19, 2013, Peter filed an appeal.

91.     A meeting was held on August 20, 2013 to attempt to resolve the appeal informally.

92.     OOD supervisor Kimberly Colyer noted that at the meeting "we discussed the UC TAP program where Peter is enrolled for his second year. This program is a good fit for Peter, he did a great job last year and really enjoyed an internship doing office work. I explained that RSC [OOD] could not pay for the program fee but we could pay for vocational services such as

job coaching.  Mrs. Merz was okay with this resolution."  (Appellant Ex. I.)

93.     Nevertheless, Ms. Colyer later concluded that the agency could not support even the vocational components of the TAP program because the program was not accredited by the Commission on Accreditation of Rehabilitation Facilities (CARF).

94.     Prior to this meeting, no one from OOD raised any issues with the accreditation of the University of Cincinnati or the TAP program.

95.     OOD's administrative regulations require that service providers must either be licensed by the state, or in the case of community rehabilitation programs, providing vocational evaluation, work adjustment, personal adjustment, job placement, job coaching, and community-based assessment service programs, accredited by CARF.  Ohio Admin. Code § 3304-2-53(A); Ohio Admin. Code § 3304-1-12(A).

96.     OOD does not require CARF accreditation from other college programs, and currently funds students attending other programs at the University of Cincinnati which are not CARF-accredited.

## Formal Hearing

97.     On December 2 and 17, 2013, a Fair Hearing was held before Hearing Officer, David G. Hasselback.

98.     Evidence presented at the hearing established that Peter had expressed interest in a career related to sports during the comprehensive assessment process, and that OOD did not engage in further counseling or discussion with Peter about his employment goal following his identification of an employment goal.

99.     Evidence presented at the hearing established that Peter, his parents, his high school teachers, University of Cincinnati faculty, and Peter's OOD counselor Chrystal Hutzel all determined that the academic, vocational, and independent living training provided by the TAP

program was necessary for Peter to prepare for competitive employment.

100. Evidence presented at the hearing established that Peter was found eligible for services in July 2012, and that OOD failed to develop an IPE for Peter before his case was closed on June 21, 2013.

101. At the hearing, the agency advanced a number of new arguments to justify its decision not to support Peter's participation in the TAP program, and testimony was presented about the agency's process for developing its policy of refusing to support Comprehensive Transition Programs.

102. Deputy Director Susan Pugh testified that she is responsible for policy making for the Bureau of Vocational Rehabilitation at OOD.

103. Ms. Pugh testified that based on information provided by BVR's area managers, she personally made the substantive policy decision that OOD could not support individuals attending Comprehensive Transition Programs in Ohio, including the TAP program.

104. Ms. Pugh testified that she had no particular concerns about the quality of Ohio's Comprehensive Transition Programs generally, but rather she believed that they were not sufficiently focused on employment, and that the academic and independent living components of the programs could not qualify as vocational rehabilitation services.

105. Prior to the formation of this policy, no public hearings were held throughout the state to provide the public, including individuals with disabilities, the opportunity to comment on the policy.

106. After making her decision, Ms. Pugh communicated this substantive policy orally to area managers for distribution throughout the agency, but a written policy was never prepared.

107. Ms. Pugh testified that she did not review Peter's case, or make an individualized

determination that the TAP program was not a necessary vocational rehabilitation service for him.

108.    OOD Area Manager Mark Fay testified that he believed the TAP program did not have a sufficient focus on employment and did not offer a meaningful credential recognized by employers.

109.    However, Mr. Fay admitted that in forming his conclusions, he did not review the TAP program's curriculum, and he was unaware that the program had a required internship component and that students developed a digital portfolio documenting work experience and skills and received a certificate of completion.

110.    Following Ms. Pugh's decision not to support Comprehensive Transition Programs, Mr. Fay sent an email to OOD supervisor Jennifer Roeder on June 4, 2013 advising that "Program is TAPS at UC (sic) and TOPS at OSU and RSC won't be paying for consumers to do it.  Susan herself made this call based on input from AMs."  (Appellant Ex. V.)

111.    Ms. Roeder forwarded Mr. Fay's email to Peter's counselor Chrystal Hutzel, who responded:  "just make sure he knows the situation of how we agreed to support this coming year, and how the mom will be reacting to this news . . . and how we handle that."  *Id.*

112.    After confirming that Ms. Hutzel had not yet prepared a written plan to fund the program for Peter, Ms. Roeder sent a follow up email to Ms. Hutzel: "[s]ince you and I reviewed this case new information has emerged.  RSC cannot support this program.  You can forewarn the mom so she isn't surprised.  But, the message is clear, RSC cannot support this program. Sorry ☹."  *Id.*

113.    At the hearing, Ms. Roeder testified that contrary to the determination of Peter, his parents, his high school teachers, the faculty at the University of Cincinnati, and Peter's

counselor Chrystal Hutzel, she believed that due to Peter's cognitive disabilities, the coursework, internships, and independent living skills offered by the TAP program would not benefit Peter in securing competitive employment and he should be immediately placed in a low-skilled job.

114.     Ms. Roeder further testified that she believed Peter's participation in the TAP program impeded the agency's assessment of Peter by causing him to lose interest in low skilled jobs such as the janitorial position with the YMCA, to which she believed he was better suited.

115.     Ms. Roeder admitted that in reaching her conclusion that Peter would not benefit from the TAP program, she relied primarily on Peter's IQ, and she did not request or review any documentation of Peter's progress in the TAP program.

116.     Ms. Roeder further testified that she believed the TAP program was unacceptably "segregated" based on personal research at a website she could no longer recall, though admitted she made no investigation to validate this conclusion.

117.     Prior to her testimony at the hearing, Ms. Roeder made no written record documenting her determination that the TAP program would not benefit Peter, or her belief that the program interfered with the agency's assessment of Peter's vocational rehabilitation needs.

118.     On January 16, 2014, the Hearing Officer issued a decision upholding the agency's decision not to support the TAP program, finding both that the agency's decision was justified because he believed that no job goal had been identified for Peter and therefore the TAP program would not lead to an employment goal.

## V.     COUNT ONE

119.     OOD's determination not to support Peter's participation in the TAP program, and the hearing officer's decision upholding that determination were contrary to the requirements of the Rehabilitation Act and must be overturned.

120.     Federal law requires that the hearing officer issue a decision based on the

provisions of the approved State plan, the Rehabilitation Act, 29 U.S.C. § 701, *et seq*. and its implementing regulations, and State regulations and policies that are consistent with the federal requirements specified in the title. 29 U.S.C. § 722(c)(5)(A).

121. OOD's decision to deny support for Peter's participation in the TAP program violated the Rehabilitation Act and its implementing regulations:

      a)       OOD failed to make available to Peter vocational rehabilitation services to assist him in preparing for, securing, retaining, or regaining an employment outcome consistent with his strengths, resources, priorities, concerns, abilities, capabilities, interests, and informed choice, specifically vocational rehabilitation counseling and guidance, vocational and other training services, and transition services, as required by 34 C.F.R. § 361.48(c), (f), and (r).

      b)       OOD failed to afford Peter the opportunity to exercise informed choice in selecting an employment outcome, the specific vocational rehabilitation services to be provided under the plan, the entity that will provide the vocational rehabilitation services, and the methods used to procure the services, as required by 29 U.S.C. § 722(b)(2)(B).

      c)       OOD supervisory staff rejected the conclusions of Peter, his parents, his high school teachers, faculty of the University of Cincinnati, and OOD counselor Chrystal Hutzel that the transition services provided by the TAP program were vocational rehabilitation services necessary for Peter to obtain competitive employment, without reliable, probative, or substantial evidence to support their determination, in violation of 34 C.F.R. § 361.48.

d)　　OOD failed to develop an IPE for Peter in consideration of Peter's individualized education plan, as required by 34 C.F.R. § 361.45(d)(8)(i).

e)　　OOD failed to timely develop an IPE for Peter before his graduation from high school as required by 34 C.F.R. § 361.45(a)(1) and 34 C.F.R. § 361.22(a).

f)　　OOD failed to timely develop an IPE for Peter within 120 days of his eligibility determination as required by 34 C.F.R. § 361.45(a)(1) and the agency's policies.

g)　　OOD denied Peter necessary vocational rehabilitation services pursuant to a substantive policy regarding the nature and scope of vocational rehabilitation services which was developed based on incomplete and erroneous facts, without public participation as required by 34 C.F.R. § 361.20, and which the agency failed to maintain in writing as required by 34 C.F.R. § 361.50(a).

h)　　OOD denied Peter necessary vocational rehabilitation services pursuant to a policy which set an arbitrary limit on the nature and scope of vocational rehabilitation services available to transition students with intellectual disabilities, in violation of 34 C.F.R. § 361.50(a).

i)　　OOD denied Peter necessary vocational rehabilitation services pursuant to a policy which failed to ensure that the provision of services is based on the rehabilitation needs of each individual consistent with informed choice, as required by 34 C.F.R. § 361.50(a).

j)　　OOD denied Peter necessary vocational rehabilitation services on the basis of discriminatory stereotypes about the abilities of individuals with intellectual disabilities rather than making an individualized determination based on Peter's

vocational needs consistent with his strengths, resources, priorities, concerns, abilities, capabilities, interests, and informed choice, in violation of 34 C.F.R. § 104.4(b)(i)-(iv).

122.   The decision of the hearing officer upholding OOD's determination did not follow the Rehabilitation Act and its implementing regulations:

a)      In reaching his decision, the hearing officer ignored evidence and arguments presented at the hearing demonstrating both procedural and substantive violations of the Rehabilitation Act by OOD as detailed in the preceding paragraph.

b)      In reaching his decision, the hearing officer ignored uncontroverted evidence presented at trial that the TAP program complies with federal guidelines for Comprehensive Transition Programs and tailors each student's course of study to prepare them for competitive gainful employment when he reached the erroneous conclusions that "in fact, there is no employment goal set for a participant" and "the TAP program is not related to a satisfactory employment outcome."  (Hearing Officer Decision, ¶¶ 20(a)(ii), 23(a)).

c)      The hearing officer erred in finding that the agency was justified in refusing to support Peter's participation in the TAP program on the basis of a lack of agreed employment goal where the evidence demonstrated that Peter had identified an employment goal of a career related to sports and requested transition services from the TAP program to reach that goal, and OOD failed to engage in counseling or discussion with Peter about his employment goal and necessary services.

      d)      The hearing officer erred in refusing to admit or consider relevant evidence proffered by Peter at the hearing documenting OOD's recent decline in competitive employment outcomes for transition youth receiving services from OOD, and data demonstrating the effectiveness of Comprehensive Transition Programs in improving competitive employment for transition youth with intellectual disabilities.

123.     Accordingly, Defendants did not follow the procedures of the Rehabilitation Act, 29 U.S.C. § 701, *et seq.* or its implementing regulations, in providing vocational rehabilitation services to Peter and this has caused Peter harm because he will not receive support for necessary vocational rehabilitation services as a result.

## VI.    COUNT TWO

124.     Peter is a person with a disability, within the meaning of 29 U.S.C. § 705, who is otherwise qualified to benefit from the vocational rehabilitation services provided by Defendants.

125.     Peter's disabilities limit him in several major life activities, including but not limited to: communication, thinking, and self-direction.

126.     Federal regulations enforcing Section 504 specifically provide that:

A recipient, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of handicap:

(i) Deny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service;

(ii) Afford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii) Provide a qualified handicapped person with an aid, benefit, or service that is not as effective as that provided to others;

(iv) Provide different or separate aid, benefits, or services to handicapped persons or to any class of handicapped persons unless such action is necessary to provide qualified handicapped persons with aid, benefits, or services that are as effective as those provided to others;

34 C.F.R. § 104.4(b)(i)-(iv).

127.    As a recipient of federal funds, OOD is subject to the non-discrimination mandate of Section 504.

128.    Defendants' decision to deny support for Peter's participation in the TAP program violated the Rehabilitation Act and its implementing regulations:

a)    While post-secondary training remains an option for other OOD consumers, through its statewide ban on support for Comprehensive Transition Programs including the TAP program, OOD has effectively denied Peter and other individuals with intellectual disabilities the opportunity to receive post-secondary training and transition services to achieve competitive employment, in violation of 34 C.F.R. § 104.4(b)(i)-(iv).

b)    Defendants have intentionally denied Peter necessary transition and post-secondary training services on the basis of discriminatory stereotypes about the abilities of individuals with intellectual disabilities rather than making an individualized determination based on Peter's vocational needs consistent with his strengths, resources, priorities, concerns, abilities, capabilities, interests, and informed choice, in violation of 34 C.F.R. § 104.4(b)(i)-(iv).

129.    Peter has suffered harm, including loss of access to vocational rehabilitation services, as the result of Defendants' violation of his rights under Section 504.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court to:

A.      Reverse the hearing officer's decision upholding OOD's determination to deny support for Peter's participation in the TAP program.

B.      Declare that OOD's policy of refusing to support eligible transition students with intellectual disabilities to attend Comprehensive Transition Programs violates the Rehabilitation Act of 1973 as amended.

C.      Order OOD to prepare an IEP for Peter which includes his employment goal of a career related to sports, and transition services including academic, vocational, and independent living training to be provided by the TAP program.

D.      Order that Defendants pay Plaintiff's attorney fees and costs to the extent provided by law.

E.      Grant such further relief as this Court deems just and proper.

Respectfully submitted,

s/Emily C. White
Emily C. White (0085662)
ewhite@disabilityrightsohio.org
Trial Attorney
Barbara S. Corner (0064780)
bcorner@disabilityrightsohio.org
Ohio Disability Rights Law and Policy Center, Inc.
Disability Rights Ohio
50 West Broad Street, Suite 1400
Columbus, Ohio  43215
Telephone:  (614) 466-7264
Facsimile:   (614) 644-1888

Counsel for Plaintiffs